**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LEANNE S.,

                                        Plaintiff,

           v.

                                                          No. 3:20-CV-1447
COMMISSIONER OF SOCIAL SECURITY,                          (CFH)

                                        Defendant.

**APPEARANCES:**                        **OF COUNSEL:**

Lachman, Gorton Law Firm                PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761
Attorney for plaintiff

Social Security Administration          JESSICA RICHARDS, ESQ.
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER[1]

        Leanne S.[2] ("plaintiff" or "the claimant") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security ("the

---

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 6.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

Commissioner") denying her applications for social security income and disability insurance benefits.  <u>See</u> Dkt. No. 1 ("Compl.").  Plaintiff moves for judgment on the pleadings.  <u>See</u> Dkt. No. 13.  The Commissioner cross moves for judgment on the pleadings.  <u>See</u> Dkt. No. 18.  Plaintiff replies.  <u>See</u> Dkt. No. 20-1.  For the following reasons, plaintiff's motion is granted, the Commissioner's motion is denied, and the Commissioner's decision is reversed and remanded for further proceedings.

## I. Background

On November 30, 2017, plaintiff filed Title II and Title XVI applications for disability insurance and supplemental security income benefits.  <u>See</u> T. at 224-37, 247-48.[3]  Plaintiff alleged a disability onset date of April 8, 2007.  <u>See</u> <u>id.</u> at 224, 231.  The Social Security Administration ("SSA") denied plaintiff's claims on February 28, 2018.  <u>See</u> <u>id.</u> at 157.  Plaintiff requested a hearing, <u>see</u> <u>id.</u> at 165, and a hearing was held on October 17, 2019, before Administrative Law Judge ("ALJ") David Romeo.  <u>See</u> <u>id.</u> at 99-135.  On January 7, 2020, the ALJ issued an unfavorable decision.  <u>See</u> <u>id.</u> at 63-92.  On September 29, 2020, the Appeals Council denied plaintiff's request for review.  <u>See</u> <u>id.</u> at 56-61.  Plaintiff timely commenced this action on November 24, 2020.  <u>See</u> Compl.

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  <u>See</u> Dkt. No. 12.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

## II. Legal Standards

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The substantial evidence standard is "a very deferential standard of review . . . .  [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks, citation, and emphasis omitted).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986).  However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

3

independent analysis of the evidence may differ from the [Commissioner's]."  <u>Rosado v.</u>
<u>Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . .
benefit . . . ."  42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage
in any substantial gainful activity by reason of any medically determinable physical or
mental impairment . . . which has lasted or can be expected to last for a continuous
period of not less than 12 months[.]"  <u>Id.</u> § 423(d)(1)(A).  A medically-determinable
impairment is an affliction that is so severe that it renders an individual unable to
continue with his or her previous work or any other employment that may be available to
him or her based upon age, education, and work experience.  <u>See id.</u> § 423(d)(2)(A).
Such an impairment must be supported by "medically acceptable clinical and laboratory
diagnostic techniques."  <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is
"based on objective medical facts, diagnoses[,] or medical opinions inferable from [the]
facts, subjective complaints of pain or disability, and educational background, age, and
work experience."  <u>Ventura v. Barnhart</u>, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3
(S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir.
1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R.
§ 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff last met the insured status through March 31, 2012, and that she had not

engaged in substantial gainful activity since April 8, 2007, the alleged onset date.  See T. at 69.  At step two, the ALJ found that plaintiff had "the following severe impairments: chronic cystitis with overactive bladder, bilateral foot pain with pes planus, left foot plantar fasciitis and tarsal tunnel syndrome, right tibial tendonitis, lumbar spondylolisthesis, and Ehlers-Danlos Syndrome [("EDS")] type 3[.]"  Id.  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See id. at 74.  Before reaching step four, the ALJ concluded that plaintiff retained "the residual functional capacity [('RFC')] to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)."  Id. at 76.  At step four, the ALJ determined that plaintiff was unable to perform past relevant work.  See id. at 85.  At step five, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]"  Id. at 86.  Thus, the ALJ determined that plaintiff had "not been under a disability, as defined in the Social Security Act, from April 8, 2007, through the date of th[e] decision[.]"  Id.

## IV. Discussion[4]

Plaintiff argues that (1) "[t]he Appeals Council failed to consider the newly submitted treating physician opinion" when it denied review of the ALJ's decision; (2)

---

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

the ALJ's RFC determination "is not supported by a proper medical opinion" because the ALJ rejected the opinions of plaintiff's treating sources and inappropriately relied on the consultative examiner's and state agency consultant's opinions; (3) "the ALJ improperly substitute[d] his judgment for that of the undisputed medical opinions on the issues of the need to change positions and/or elevate the feet[]"; (4) the ALJ failed "to properly assess limitations to staying on task and/or maintaining attendance"; and (5) the ALJ erred in relying solely on the Medical-Vocational Guidelines ("Grids") at step five.  Dkt. No. 13 at 12-27.

The Commissioner argues that (1) plaintiff failed to provide "good cause" for why the newly submitted evidence was not provided to the ALJ; (2) the additional evidence is not "material" and would not change the outcome of the ALJ's decision; and (3) the ALJ's decision is supported by substantial evidence.  Dkt. No. 18 at 19-22; 4-17.

### A.  Appeals Council

Following the ALJ's unfavorable decision, plaintiff requested review by the Appeals Council and "submitted medical records from Chin-To Fong, M.D. . . ., [and] Lourdes Rehabilitation Department . . .; Medical Questionnaires . . . completed by Sara Salim, M.D.[]"; "a Broome County DSS Medical Assessment Form . . . completed by Sara Salim, M.D.; a summary of treatment from Casey Trexler, DC . . . ; and a letter from Sara Salim, M.D. . . [.]"  T. at 57.  In denying review of the ALJ's decision, the Appeals Council stated that plaintiff "submitted reasons that [she] disagree[d] with the [ALJ's] decision.  We considered the reasons and exhibited them on the enclosed Order of the Appeals Council.  We found that the reasons do not provide a basis for changing the Administrative Law Judge's decision."  Id. at 56.  The Appeals Council explained

that it "found no reason under our rules to review the Administrative Law Judge's decision.  Therefore, we have denied your request for review.  This means that the Administrative Law Judge's decision is the final decision of the Commissioner of Social Security in your case."  Id.  Specifically, as to the additional evidence, the Appeals Council stated that it found "that the evidence does not show a reasonable probability that it would change of the outcome of the [ALJ's] decision."  Id. at 57.

Plaintiff argues that the Appeals Council erred by not explaining "how persuasive" Dr. Salim's opinion was according to 20 C.F.R. § 404.1520c.[5]  Dkt. No. 13 at 20-21.  Plaintiff states that "the Appeals Council failed to review the case despite being required to do so[]" because "Dr. Salim's opinion is new, material, and is likely to change the outcome[]" of the ALJ's decision.  Id. at 22.  Plaintiff also contends that "[e]ven if the Appeals Council did not commit error, this new evidence must be considered on appeal in determining whether the ALJ's decision is supported by substantial evidence[]" and "this new evidence shows the ALJ's RFC is not supported by substantial evidence."  Id. at 21-22.  The Commissioner argues that "[p]laintiff must show 'good cause' for the failure to submit [the] evidence to the ALJ in the first instance[.]"  Dkt. No. 18 at 19 (quoting 20 C.F.R. § 404.970(b)(3)(iv)).  The Commissioner also asserts that Dr. Salim's opinion is not "material" and would not change the outcome of the ALJ's decision.  Id. at 20-22.

### 1.  Analysis

### a. "Good Cause" Requirement

---

[5] The regulations relevant to a Title XIV claims are identical to those applicable to plaintiff's Title II claim.  See, e.g., 20 C.F.R. § 419.920c.  Throughout their briefs, plaintiff and the Commissioner cite primarily to the Title II regulations.  See Dkt. No. 13 at 20; Dkt. No. 18 at 3, n.2.  Accordingly, the Court will do the same.

The regulations state that "[t]he Appeals Council will review a case . . . if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 404.970(a)(5).  The regulations also note that "[t]he Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if you show good cause for not informing us about or submitting the evidence . . . ."  Id. § 404.970(b).

The Commissioner's reliance on 20 C.F.R. § 404.970(b) is misplaced.  The Commissioner argues that plaintiff "must show 'good cause' for the failure to submit evidence to the ALJ in the first instance[.]"  Dkt. No. 18 at 19 (quoting 20 C.F.R. § 404.970(b)(3)(iv)).  The regulation plaintiff relies on dictates when and under what circumstances the Appeals Council will consider additional evidence and review an ALJ's decision.  See 20 C.F.R. § 404.970(a), (b).  Here, the Appeals Council considered plaintiff's additional evidence and determined that it would not change the outcome of the ALJ's decision; thus, it did not review the ALJ's decision.  See T. at 56-57.

The relevant regulation that governs the Court's consideration of the additional evidence is 42 U.S.C. § 405(g).  The Code states that the Court may "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]"  42 U.S.C. § 405(g) (emphasis added).  Dr. Salim's medical opinion, which is the subject of the Commissioner's challenge, was submitted to the Appeals Council.  See Dkt. No. 18 at 19; see also T. at 57.  The regulations do not require the evidence to have been

submitted to the ALJ, but only a "prior proceeding" for the Court to consider it. 42 U.S.C. § 405(g); see Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996) ("[T]he new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision. . . .  The only limitations stated in these rules are that the evidence must be new and material and that it must relate to the period on or before the ALJ's decision. This regulation was promulgated by the Secretary to provide claimants a final opportunity to submit additional evidence before the Secretary's decision becomes final.").

The Commissioner's case citations are inapposite. See Dkt. No. 18 at 19.  First, Amanda L. C. v. Comm'r of Soc. Sec. merely reiterates the standard set forth 20 C.F.R. § 404.970(a)(5), (b), and provides no analysis of the "good cause" requirement.  No. 3:19-CV-0817 (GTS), 2020 WL 4783169, at *6 (N.D.N.Y. Aug. 18, 2020).  Second, plaintiff's other two case citations address the "good cause" requirement in the context of the plaintiff seeking admission of new evidence that was not before the ALJ or the Appeals Council.  Dkt. No. at 19-20; see also Doner v. Comm'r of Soc. Sec., No. 8:16-CV-0883 (CFH), 2017 WL 3172419, at *4 (N.D.N.Y. July 25, 2017); Colabufo v. Colvin, No. 5:13-CV-188 (GLS/ESH), 2014 WL 2510559, at *4 (N.D.N.Y. June 4, 2014).  Here, plaintiff submitted the evidence to the Appeals Council, and as such, there is no requirement that plaintiff show "good cause" for the failure to produce the evidence to the ALJ.  Cf. Doner, 2017 WL 3172419, at *4 (emphasis added) ("[T]his Court finds that a remand is not warranted for consideration of the additional evidence presented for the

first time to this Court because [the p]laintiff has not shown that there was good cause for failing to submit these records to either the ALJ or the Appeals Council.").

Further, whether plaintiff failed to show "good cause" to the Appeals Council as to why the evidence was not provided to the ALJ was not a "reason[] provided by [] the Appeals Couns[i]l. A reviewing court may not accept appellate counsel's post hoc rationalizations for agency action." Newbury v. Astrue, 321 F. App'x 16, 18 (2d Cir. 2009) (summary order) (quotation marks omitted) (quoting Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); see also 20 C.F.R. § 404.970(c) (stating that if "the Appeals Council does not find you had good cause for missing the dealing to submit the evidence [], the Appeals Council will send you a notice that explains why it did not accept the additional evidence and advises you of the right to file a new application.").

### b. "Persuasiveness" of a Newly Submitted Medical Opinion

To the extent plaintiff argues that the Appeals Council erred by not "stat[ing] how persuasive [Dr. Salim's] opinion is[,]" the Court finds no error. Dkt. No. 13 at 21.[6] This Court has recently considered a similar argument and concluded that, in denying review of an ALJ's decision, "[t]he regulations do not require the Appeals Council to issue a decision" and "the Appeals Council is not making the initial or reconsideration disability determination"; thus, "the Appeals Council [i]s not required to explain its reasoning . . ." concerning the persuasiveness of a newly submitted medical opinion. Bruce Wayne C. v. Comm'r of Soc. Sec., No. 5:21-CV-160 (CFH), 2022 WL 1304024, at *6-7 (N.D.N.Y. May 2, 2022) (citations omitted). This conclusion was derived from a review of

---

[6] The Commissioner does not respond to this argument. See generally Dkt. No. 18; see also Dkt. No. 20-1 at 4.

Magistrate Judge Peeble's analysis in <u>Jessica W. v. Saul</u>, No. 5:19-CV-1427 (DEP), 2021 WL 797069, at *8 (N.D.N.Y. Mar. 2, 2021); authority from the First, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits; and the regulatory distinction between a "decision," "determination," and denial of review.  <u>Id.</u> at *4-*7.

      To briefly reiterate the analysis, there is a body of caselaw that has required the Appeals Council to apply the treating physician rule and the newer regulations' "persuasiveness" rule to its consideration of a newly submitted medical opinion.  <u>See, e.g.</u>, <u>Howard D. v. Saul</u>, No. 5:19-CV-01615 (BKS), 2021 WL 1152834, at *14 (N.D.N.Y. Mar. 26, 2021); <u>Leah H. v. Comm'r of Soc. Sec.</u>, 3:20-CV-445 (CFH), 2021 WL 4033129, at *9 (N.D.N.Y. Sept. 3, 2021); <u>Mark D. v. Comm'r of Soc. Sec.</u>, 6:20-CV-06392 (EAW), 2021 WL 4059326, at *3 (W.D.N.Y. Sept. 7, 2021); <u>Patrick M. v. Saul</u>, 3:18-CV-290 (ATB), 2019 WL 4071780, at *7 (N.D.N.Y. Aug. 28, 2019).  In reviewing the relevant line of cases, Magistrate Judge Peebles discovered, and the undersigned agreed, that those cases found their origins in <u>Shrack v. Astrue's</u> application of <u>Snell v. Apfel</u>.  <u>See</u> <u>Jessica W.</u>, 2021 WL 797069, at *8 (citing <u>Snell v. Apfel</u>, 177 F.3d 128 (2d Cir. 1999); <u>Shrack v. Astrue</u>, 608 F. Supp. 2d 297 (D. Conn. 2009)) (explaining that "[i]n <u>Snell</u>, rather than merely denying review of an ALJ decision, the Appeals Council addressed the merits of the matter *sua sponte*, and reversed the decision of the ALJ to grant benefits.  In that case, the Appeals Council proactively considered the record and issued a merits-based decision and, in doing so, was plainly obligated to apply the treating source rule, just as an ALJ must when making an initial determination."); <u>see also</u> <u>Bruce Wayne C.</u>, 2022 WL 1304024, at *4.

The Second Circuit "expressly declined to address whether the Appeals Council had an independent duty to explain why a treating physician's opinion was given less than controlling weight." Bruce Wayne C., 2022 WL 1304024, at *6 (citing Lesterhuis v. Colvin, 805 F.3d 83, 89 (2d Cir. 2015) (per curiam)).  Turning to the regulations, it became clear that a denial of review is not the same as (1) the Appeals Council reviewing the ALJ's decision and writing a decision; or (2) the initial or reconsideration disability determinations. See id. at *6-7.  This regulatory interpretation is supported by caselaw from eight circuit courts. See id. (collecting cases from the First, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits that "distinguish the articulation requirements for the Appeals Council denying review versus it issuing a decision.").

The Court finds no reason to reconsider its previous rationale and concludes that because, in this instance, the Appeals Council denied review of the ALJ's decision, it was not required to articulate its review of the newly submitted evidence under the regulations for evaluating the persuasiveness of a medical opinion. See Bruce Wayne C., 2022 WL 1304024, at *4, *7; see also Lisa C. v. Kijakazi, No. 3:21-CV-0037 (ATB), 2022 WL 2105853, at *11 (N.D.N.Y. June 10, 2022) (citation omitted) (relying on Jessica W. and Bruce Wayne C., and "likewise hold[ing] that the Appeals Council was not required to explain its reasoning for denying review of the ALJ's decision . . . ."); cf. Michele A. v. Kijakazi, No. 6:21-CV-185 (MAD), 2022 WL 4225171, at *6 (N.D.N.Y. Sept. 12, 2022) ("[T]he Court holds that when the Appeals Council merely denies a request for review of a determination, it is under no obligation to explain the weight given to a treating source opinion submitted as new evidence following an ALJ's determination.").  Accordingly, remand is not warranted on this ground.  Cf. Leroy R. v.

13

Comm'r of Soc. Sec., No. 1:20-CV-01299 (EAW), 2022 WL 4128894, at *6-7 (W.D.N.Y. Sept. 12, 2022) (emphasis added) (citing 20 C.F.R. § 416.1470 (a)(5), (b)) ("[The p]laintiff correctly notes that the Appeals Council must consider additional evidence so long as it is new, material, and relates to the period on or before the ALJ's decision. . . . [T]he Appeals Council is not required to specifically discuss all the records submitted for its review in its decision when it denies review.") (citing Stephanie R. obo I.S. v. Comm'r of Soc. Sec., No. 1:19-CV-1037 (DB), 2020 WL 7640936, at *9 (W.D.N.Y. Dec. 23, 2020) ("Although the Appeals Council did not specifically discuss all the records at issue, it was not required to do so under the regulations.  The Appeals Council is not required to provide an elaborate explanation when it evaluates additional evidence presented.")).

### c. Consideration of the Newly Submitted Medical Opinion

Neither party briefed the issue as to whether the Court has jurisdiction to review the Appeals Council's conclusion that the newly submitted evidence would not change the outcome of the ALJ's decision.  See Dkt. No. 13 at 22; Dkt. No. 18 at 20-22. However, the issue is implicitly raised by plaintiff's arguments that the Appeal Council erred in denying review of the ALJ's decision because the evidence would change the outcome of the ALJ's decision.  See Dkt. No. 13 at 22.

This Court has stated that

[a]lthough the Commissioner is correct that, pursuant to § 405(g), this Court only has jurisdiction over final decision[s] of the Commissioner . . . which, in this case, is the ALJ's decision, it is well-settled that [t]he role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision.

Kirah D. v. Berryhill, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *4 (N.D.N.Y. Feb. 13, 2019) (internal quotation marks omitted) (citing, inter alia, Allborty v. Comm'r of Soc. Sec., No. 6:14-CV-1428 (DNH/ATB), 2016 WL 770261, at *8 (N.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 796071 (N.D.N.Y. Feb. 22, 2016). The Kirah D., Court explained that "the issue before the Court is whether the new evidence altered the weight of the evidence before the ALJ so dramatically as to require the [Appeals Council] to take the case." Id. (quoting Canady v. Comm'r of Soc. Sec., No. 1:17-CV-0367 (GTS/WBC), 2017 WL 5496071, at *11 (N.D.N.Y. Oct. 4, 2017), report and recommendation adopted, 2017 WL 5484663 (N.D.N.Y. Nov. 14, 2017); citing Bushey v. Colvin, 552 F. App'x 97, 98 (2d Cir. 2014) (summary order)).

To the extent the Northern District of New York cases rely on Bushey v. Colvin, they are relying on the Second Circuit's statement that

> [w]e do not believe that the Appeals Council erred by refusing to review the ALJ's decision in light of the new evidence that Bushey submitted to that body. The Appeals Council had substantial evidence supporting its decision to decline review, as the new evidence that Bushey presented did not alter the weight of the evidence so dramatically as to require the Appeals Council to take the case.

552 F. App'x 97, 98 (2d Cir. 2014) (summary order). Bushey, however, did not cite any legal authority for its conclusions. See id. Similarly, the caselaw relies on Woodford v. Apfel, which concluded that the newly submitted evidence "met the requirements of 20 C.F.R. § 404.970(b), and that the Appeals Council erred when it determined that this evidence was insufficient to trigger review of the ALJ's decision." 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000). Woodford did not provide any legal authority supporting its jurisdiction to review the Appeals Council's decision. See id. The cases also rely on Shrack, 608 F. Supp. 2d at 302 and Milano v. Apfel, 98 F. Supp. 2d 209, 216 (D. Conn.

15

2000), both of which rely on Perez, 77 F.3d at 45.  See, e.g., Sears v. Colvin, No. 8:12-CV-570 (MAD/ATB), 2013 WL 6506496, at *5 (N.D.N.Y. Dec. 12, 2013).  The Perez Court held "that the new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."  Perez, 77 F.3d at 45.  The Court then proceeded to analyze whether the ALJ's decision was supported by substantial evidence, and not whether the Appeals Council conclusions were correct.  See id. (stating that the newly submitted reports did "not contradict the ALJ's finding . . . . Accordingly, the Secretary's finding that Perez was disabled as of February 13, 1992[,] is supported by substantial evidence.").  The Perez Court did not conclude that the Court's role is to review the accuracy of the Appeals Council's conclusion concerning the newly submitted evidence when the Appeals Council has summarily denied review of an ALJ's decision.  See id.

As such, the Court again agrees with Magistrate Judge Peebles conclusion in Jessica W., that because when the Appeals Council denies review of an ALJ's decision, the ALJ's decision is the final decision that is subject to judicial review, the new evidence that was submitted to the Appeals Council should be considered by the Court as part of its analysis of whether the ALJ's decision is supported by substantial evidence.  See Jessica W. v. Saul, 2021 WL 797069, at *9; see also Lisa C., 2022 WL 2105853, at *11 ("To the extent plaintiff argues that [the] opinion would have changed the underlying disability determination, we reiterate that it is not for this court to review the Appeals Council's conclusion regarding the medical opinion.") (citing Jessica W., 2021 WL 797069, at *9 ("[The p]laintiff's contention that the court has the authority to

review the Appeals Council's conclusion regarding the new medical opinion is mistaken."); 20 C.F.R. § 416.1481 ("[T]he administrative law judge['s decision,] if the request for review is denied, is binding[.]"))[7]  As such, plaintiff's arguments concerning the materiality and impact of Dr. Salim's opinion on the ALJ's decision will be considered in the Court's discussion of whether the ALJ's decision is supported by substantial evidence.  See Perez, 77 F.3d at 45.

## B.  Whether the ALJ's RFC Determination is Supported by Substantial Evidence

### 1.  Dr. Pradhan and Dr. Jenouri

#### a.  Relevant Records and the ALJ's Decision

In February 2018, Gilbert Jenouri, M.D., examined plaintiff and noted her complaints of "difficulties with her left great toe[]" and "having bone pain in her left great toe."  T. at 403.  Dr. Jenouri noted plaintiff's tarsal tunnel syndrome diagnosis, knee and hip pain, and "history of interstitial cystitis[.]"  Id.  On examination, plaintiff was not in acute distress, had a normal gait, walked on her heels and toes "with difficulty[,]" her squat was fifty percent, she did not use an assistive device, and did not need help.  Id. at 404.  Plaintiff's "[c]ervical spine show[ed] full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  No scoliosis, kyphosis or abnormality in thoracic spine."  Id. at 405.  Plaintiff had range of motion limitations in her lumbar spine, "minimal scoliosis with right convexity[,]" and pain with straight leg raises.  Id.  Plaintiff also had range of motion limitations in her hips, knees, and ankles.  See id.  There was

---

[7] The Court also notes that the fundamental inquiry in either analysis is essentially the same, with the Court asking (1) whether the Appeals Council erred in concluding that the additional evidence would not change the ALJ's outcome or (2) whether, considering the additional evidence, the ALJ's outcome is supported by substantial evidence in the record.  However, it is a distinction with a sufficient enough difference that it bears discussion given the line of cases directly addressing the Appeals Council's decision versus the recent set of cases considering the Appeals Council's role and responsibilities.

"[n]o evident subluxations, contractures, ankylosis, or thickening.  Joints stable and nontender.  No redness, heat, swelling, or effusion."  Id.  Plaintiff had full strength in her upper and lower extremities, intact dexterity, and full grip strength.  See id.  Dr. Jenouri reviewed a left knee X-ray.  See id. at 406.  Dr. Jenouri diagnosed plaintiff with left knee pain, bilateral hip pain, and left foot pain; and determined that she had "mild restriction[s] walking and standing long periods, bending, stair climbing, lifting, and carrying."  Id.

In February 2018, R. Pradhan, M.D., completed plaintiff's initial disability determination and noted that plaintiff alleged disability due to the following physical impairments: "left leg is shorter than right," severe flat feet, "tarsal tunnel/boney deformities in left foot," "knee problems especially left knee," "arthritis – right hip joint socket," "scoliosis in back," spinal problems, severe lower back pain, migraines, chronic interstitial cystitis, over active bladder, urine in blood, "dysmeneria," thyroid problems, and obesity.  T. at 136-37, 144.  Dr. Pradhan determined that plaintiff's "Dysfunction – Major Joints" was her only severe impairment.  Id. at 140.  Dr. Pradhan limited plaintiff to occasionally lifting or carrying fifty pounds; frequently carrying or lifting twenty-five pounds; and standing, walking, or sitting for six hours in an eight-hour day.  See id. at 143.  Dr. Pradhan indicated that these limitations were "due to mild back scoliosis."  Id.

In the "Additional Explanation" section of the determination, Dr. Pradhan noted that there was no medical evidence to indicate ongoing problems with or treatment for plaintiff's migraines; no medical evidence to indicate diagnoses of thyroid problems; her activities of daily living did not document limitations due to thyroid problems; there was no medical evidence to establish diagnoses or medically determinable impairments for

18

her kidney or bladder problems; there was imaging reflective of mild scoliosis, but she had no abnormal movements; and she was not receiving ongoing treatment for pain management of her back, knee, foot, or hip.  T. at 144.  Dr. Pradhan reiterated Dr. Jenouri's consultative examination findings and plaintiff's allegations that she is limited in her ability to stand, walk, sit, climb stairs, squat, and reach.  See id.  However, Dr. Pradhan determined that there was no medical evidence to support the limitations and imaging was "essentially [within normal limits] with only mild limitations."  Id.; see also T. at 151 ("Despite sending for [medical evidence] from 1/07 to present, no [medical evidence] received during [the claimant's] insured timeframe to evaluate these allegations.  Insufficient evidence.").

In determining plaintiff's RFC, the ALJ stated that "[a]s for opinion evidence, the established residual functional capacity is generally supported by the medical opinion of State agency medical consultant, R. Pradhan, M.D.  Following a comprehensive review of the record, Dr. Pradhan determined that the claimant could perform medium work due to the combination of her impairments[.]"  T. at 79 (citing T. at 136-54, 411-12).  The ALJ explained that although he found "somewhat greater exertional limitations than were identified by Dr. Pradhan, the State agency medical opinion is persuasive because it is generally supported by the objective medical evidence that indicates that the claimant is precluded from performing very heavy and heavy work[8] activity due to the combination of physical impairments[.]"  Id.  The ALJ concluded that plaintiff "otherwise retains the maximum residual functional capacity to perform a range of work."  Id.  "The Administrative Law Judge notes that the claimant's ability to push and pull is unlimited,

---

[8] "Exertional capabilities in turn are defined in terms of ability to perform 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work."  Decker v. Harris, 647 F.2d 291, 294 (2d Cir. 1981) (citation omitted).

other than for the weight limits already established by the sedentary exertional level."
Id.  "The additional limitations for standing or walking, in combination, for two hours total
in an eight-hour workday, are supported in part by the objective medical evidence and
the claimant's ongoing treatment for a combination of severe and non-severe
impairments, including obesity."  Id.  "However, greater exertional and non-exertional
limitations are not supported by the objective clinical and laboratory findings from
various medical sources."  Id.

The ALJ explained that "[a]s for the remaining medical opinions, the medical
opinion of consultative examiner, Gilbert Jenouri, M.D., finding that the claimant has
mild restriction for walking and standing long periods, lifting, carrying, bending, and
climbing stairs [] is somewhat persuasive."  T. at 81 (citing T. at 403-407).  The ALJ
stated that "[a]lthough additional postural limitations are not supported for the reasons
stated below, the objective clinical and laboratory findings otherwise support the degree
of limitation in the exertional categories identified by Dr. Jenouri."  Id.  The ALJ also
"noted that Dr. Jenouri did not otherwise identify significant limitations in the claimant's
ability to sit for prolonged periods or use her hands."  Id. (citing T. at 403-407).

**b. Arguments**

As to Dr. Pradhan, plaintiff argues that the opinion contains "glaring holes"
including (1) reliance on "only" the consultative examination and X-rays of plaintiff's
spine and left foot; (2) lack of knowledge concerning plaintiff's physical impairments
except for major joint dysfunction; and (3) a lack of "supportability" and "consistency."
Dkt. No. 13 at 13-17.  Plaintiff also contends that "the ALJ's analysis of Dr. Pradhan['s
opinion] is internally inconsistent and entirely illogical[]" as the ALJ found the opinion to

20

be persuasive, "but then the ALJ rejects his findings." Id. at 17.  Finally, plaintiff asserts that the "other factors weight heavily against the persuasiveness of Dr. Pradhan's opinion" because he did not examine or treat plaintiff, "and there is no indication that he has any relevant medical expertise[.]" Id. at 18.

As to Dr. Jenouri, plaintiff argues that "[t]he ALJ's assessment of Dr. Jenouri['s opinion] is in error for largely the same reasons [] as to Dr. Pradhan[.]" Dkt. No. 13 at 18-19.  Plaintiff asserts that (1) Dr. Jenouri reviewed only a left knee X-ray; (2) he "had no information concerning [p]laintiff's later diagnoses of EDS or her spondylolisthesis at L4-L5[]"; (3) the opinion is inconsistent with the longitudinal record; (4) Dr. Jenouri's examination "failed to identify the hypermobility and the problems with [plaintiff's] joints"; (5) the opinion is contrary to those of plaintiff's treating providers; (6) a "'mild restriction' is too vague to constitute substantial evidence support for the RFC[]"; and (7) Dr. Jenouri did not have a treating relationship with plaintiff or a relevant expertise. Id. at 18-20.

The Commissioner argues that (1) Drs. Pradhan and Jenouri considered most of plaintiff's impairments; (2) to the extent plaintiff received subsequent diagnoses, the record did not show a material deterioration in plaintiff's condition; (3) the ALJ analyzed the more recent treatment records; and (4) the ALJ appropriately discounted the opinions from plaintiff's treating providers which were inconsistent with Drs. Pradhan and Jenouri's opinions. See Dkt. No. 18 at 7-14.

### c.  Analysis

Generally, an ALJ may rely on an opinion from a state agency medical consultant and the opinion may constitute substantial evidence in support of an RFC

determination.  See Barber v. Comm'r of Soc. Sec., No. 6:15-CV-0338 (GTS/WBC),

2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016), report and recommendation adopted,

2016 WL 4402033 (N.D.N.Y. Aug. 18, 2016) (citing 20 C.F.R. §§ 416.912(b) (6),

416.913(c), 416.927(e); Baszto v. Astrue, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010)

("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining

State agency medical consultants, since such consultants are deemed to be qualified

experts in the field of social security disability.")).  However, "a stale medical opinion

does not constitute substantial evidence to support an ALJ's findings."  Renee L. v.

Comm'r of Soc. Sec., No. 5:20-CV-00991 (TWD), 2022 WL 685285, at *6 (N.D.N.Y.

Mar. 8, 2022) (citations omitted).  "[M]edical opinions are rendered 'stale' by a 'new

significant diagnosis' or 'significant deterioration' in the plaintiff's condition."  Id. (quoting

Andrea G. v. Comm'r of Soc. Sec., No. 5:20-CV-01253, 2022 WL 204400, at *7

(N.D.N.Y. Jan. 24, 2022)) (citation omitted).  An "opinion is not stale merely because it

pre-dates other evidence in the record, where [] 'the subsequent evidence does not

undermine [the consultant's] conclusions.'"  Michelle B. v. Comm'r of Soc. Sec., No.

1:19-CV-710 (ATB), 2020 WL 2616150, at *9 (N.D.N.Y. May 21, 2020) (quoting Healy v.

Comm'r of Soc. Sec., No. 1:18-CV-00624, 2020 WL 1428931, at *4 (W.D.N.Y. Mar. 24,

2020)) (citation omitted).  Further, "remand is warranted where more recent evidence in

the record 'directly contradict[s] the older reports of [claimant's] functioning on which the

ALJ relied' and the ALJ failed to analyze the more recent evidence."  Laura Anne H. v.

Saul, No. 6:20-CV-397 (TWD), 2021 WL 4440345, at *6 (N.D.N.Y. Sept. 28, 2021)

(quoting Blash v. Comm'r of Soc. Sec. Admin., 813 F. App'x 642, 644 (2d Cir. 2020)

(summary order) (determining that "the ALJ's failure to consider whether the older

22

evidence was stale warrants remand because the newer evidence showed that [the plaintiff's] condition had significantly changed within the relevant period.").

Plaintiff argues that "the issue here is not deterioration of a condition [] that Dr. Pradha[n] actually considered, but the fact that Dr. Pradha[n] issued a medical opinion based on the wrong impairment and that does not account for the impairments at issue here.  His opinion simply does not even consider all of [p]laintiff's severe impairments." Dkt. No. 20-1 at 2-3.  Plaintiff asserts that "[t]his is not a 'staleness' argument, but failure to consider all severe impairments in forming the medical opinion as evidence by Dr. Pradha[n]'s own narrative."  Id. at 3.

Although plaintiff asserts that she is not making a "staleness" argument, that is precisely what part of her argument concerns as she contends that there was evidence submitted subsequent to Dr. Pradhan's opinion that was not reviewed.  Dkt. No. 20-1 at 3; see Dkt. No. 13 at 19; see Andrea G., 2022 WL 204400, at *7.  First, the Commissioner asserts that Dr. Pradhan considered all of plaintiff's impairments aside from her Ehlers-Danlos syndrome.  See id. at 9-10.  This is true in that Dr. Pradhan reiterated all of plaintiff's complaints as alleged in her disability application.  See T. at 131-37, 252.  However, plaintiff's allegations are not the same as a formal diagnosis or medical records supportive of a medically determinable impairment.  Cf. Vazquez v. Saul, No. 18-CV-242, 2019 WL 3859031, at *4 (W.D.N.Y. Aug. 16, 2019) (determining that the plaintiff's "diagnosis and referral for treatment of carpal tunnel syndrome renders [the consultative examiner's] opinion stale regarding possible limitations due to that ailment.").

Plaintiff identifies evidence that she claims is "wildly inconsistent" with Dr. Pradhan's opinion.  Dkt. No. 13 at 15.  This evidence, which Dr. Pradhan did not review, indicates that plaintiff had low arches when standing and arch deformity of her left foot, reduced dorsiflexion and synovitis and tenosynovitis of the left ankle and foot, left foot and low back pain, skin rashes, headaches, insomnia, and hypermobility in the wrists, elbows, and shoulders.  See id. at 15-16 (citing T. at 414-16, 418, 442-46, 499). Plaintiff also identifies evidence of persistent leg and back pain, decreased mobility, numbness, weakness, tenderness, muscle spasms, joint pain, nerve pain, antalgic gait, positive Tinel's sign, bilateral pes planus, and polyarthralgia.  See id. at 16-17 (citing T. at 461, 463, 512-13, 516, 569, 571, 575, 577, 581, 609, 686, 728, 730).  In the records subsequent to Dr. Pradhan's review, plaintiff was diagnosed with Ehlers-Danlos syndrome and assessed for lumbar spondylolisthesis.  See id. at 516, 572.  Treatment notes also reflect that plaintiff's constant pain had resulted in her being unable to sleep for more than four hours, if she slept at all; and she began seeing a physical therapist, an orthopedist, a pain management specialist.  See id. at 416, 499-500, 508, 527, 569-85, 685.

Plaintiff asserts that "[t]hese symptoms and findings are inconsistent with Dr. Pradhan's conclusion that [p]laintiff can occasionally life 50 pounds, frequently lift 25, and stand/walk 6 hours per day."  Id. at 17.  Plaintiff also notes that Dr. Pradhan's opinion is inconsistent with the opinions from plaintiff's treating providers: Brian Timm, DPM, "[p]laintiff's podiatrist, stated [p]laintiff can stand/walk for two hours per day and she needs to elevate her feet at least 40% of the time[]; and "Dr. Salim stated [p]laintiff can walk, stand, bend, and sit no more than two hours per day, she needs to change

24

positions every 0-5 minutes to relieve discomfort, she cannot lift/carry more than 9 pounds, and she is limited in the use of her hands." Id. (citing T. at 46, 469, 622).

As the Commissioner concedes, Dr. Pradhan did not consider any of the treatment records or treating provider medical opinions that plaintiff identifies.  See T. at 142-44; see Dkt. No. 18 at 7 (citing T. at 388-96, 403-407).  Plaintiff's additional EDS and lumbar spondylolisthesis diagnoses, the treating provider medical opinions, and the treatment records evidencing plaintiff's pain, tenderness, weakness, headaches, muscle spasms, hypermobility, foot deformity, sleep disturbance, and range of motion limitations render Dr. Pradhan's opinion stale.  But see Ashley S. P. v. Comm'r of Soc. Sec., No. 5:20-CV-0794 (DEP), 2022 WL 42412, at *7 (N.D.N.Y. Jan. 5, 2022) (determining that a consultative examiner's medical opinion was not stale because the "plaintiff had been exhibiting body pain well before November 2017; the fact that providers attributed that pain solely to her ankylosing spondylosis prior to that time does not suggest that plaintiff was not experiencing the effects of fibromyalgia during that period, but instead that her symptoms had not yet been diagnosed. . . .  [The p]laintiff does not indicate how the severity or limiting effect on her functioning changed following [the] opinion – other than the later notations of tender points – in a way that would suggest that [the] opinion was no longer a reliable estimate of [the] plaintiff's observable functioning.").

However, "[c]ourts routinely decline to remand based on reliance on an allegedly stale consultative opinion where the ALJ reconciled the examiner's findings with the claimant's subsequent treatment developments and additional limitations."  Rodriguez v. Kijakazi, No. 21-CV-2358 (JCM), 2022 WL 3211684, at *15 (S.D.N.Y. Aug. 9, 2022)

25

(collecting cases) (citing, <u>inter alia</u>, <u>Jeffery M. v. Comm'r of Soc. Sec.</u>, 3:19-CV-435 (TJM), 2020 WL 3637646, at *8 (N.D.N.Y. July 6, 2020) (declining to find that the "ALJ relied on 'stale' portions of the consultative examination, since he acknowledged that [the p]laintiff's medical condition had evolved . . ., cited medical evidence that explained the changing state of [the p]laintiff's shoulder, and relied on those portions of the opinions that addressed medical conditions that still remained fairly consistent during the relevant time")).

The ALJ reviewed evidence from across the longitudinal record and explained that plaintiff "was formally diagnosed with Ehlers-Danlos Syndrome type 3 in May 2019 with elevated markers on bloodwork and symptoms primarily reflected in hypermobility or hyperlaxity of her joints." T. at 79 (citing T. at 415, 518-19, 686, 706, 728). The ALJ stated, "[h]owever, [that] notations of dislocations or subluxations of her joints occurring as frequently as daily are not reflected in laboratory testing. Instead, most of the claimant's treatment is primarily related to chronic disorders of her lumbar spine, ankles, and feet." <u>Id.</u> (citing T. at 646, 728). The ALJ acknowledged that "[r]epeat laboratory studies show evidence of scoliosis, spondylolisthesis, and/or degenerative changes without signs of herniated disc, nerve root impingement, or other acute abnormality. At times, scoliosis is described as 'minimal' or 'mild[.]'" <u>Id.</u> at 79-80 (citing T. at 387-89, 405). "Although some testing was discontinued due to the claimant's reports of pain, EMG and nerve conduction studies of the claimant's lower extremities showed posterior tarsal tunnel syndrome affecting her lateral plantar nerves, but no other significant abnormality[.]" <u>Id.</u> at 80 (citing T. at 512, 614-15). The ALJ also noted that plaintiff "reported remote history of fracture of her knee cap in 1996 that are not seen on later-

dated studies.  MRI scan of her left knee showed chondromalacia of her patella.  X-rays of her hips, left knee, and left foot are generally unremarkable[.]"  Id. (citing T. at 390-91, 407, 518, 524).  "Repeat studies and physical exams of her ankles and feet support the diagnosis of multiple impairments, including pes planus, left foot plantar fasciitis and tarsal tunnel syndrome, and right tibial tendonitis[.]"  Id. (citing T. at 497). "However, few additional findings are noted on accompanying physical exams, such as abnormal sensation, motor strength, reflexes, or edema, to support the degree of impairment identified.  X-rays of her right hand are unremarkable[.]"  Id. (citing T. at 686).

The ALJ continued, stating that "[d]espite some positive laboratory findings, hypermobility of her joints, and abnormalities of her ankles/feet, the claimant generally presents with more subjective findings for tenderness and decreased range of motion of her spine and lower extremities that are reflected in the residual functional capacity, but few other chronically positive objective clinical findings are noted on repeat physical exams to support greater limitations of functioning."  T. at 80.  The ALJ explained, "[f]or example, few exams show active muscle spasms or trigger points of the spine or extremities.  Straight leg raising (SLR) tests are not always confirmed in both the seated and supine positions.  Despite laboratory studies, not all exams show significant abnormality of the claimant's cervical or thoracic spine[.]"  Id. (citing T. at 405, 418, 528, 583, 597).  "The claimant alleged that her shoulders and neck do not lock in place, but she generally exhibits full range of motion of the upper extremities.  The claimant's allegations of the need to elevate her legs for at least a few hours per day are not reflected in physical exams."  Id. (citing T. at 405, 418, 528, 583, 597); see id. at 132-33.

Next, the ALJ stated that "[d]espite the claimant's allegations of chronic swelling from hips to feet on almost a daily basis or periodic notations of "ongoing" lymphedema of her leg, various physical exams fail to show findings for recurrent lymphedema[.]"  T. at 80 (citing T. at 416, 433, 451, 631); see id. at 117, 120.  "There are no chronic findings for redness, heat, edema, swelling, or effusion of the extremities.  There are periodic complaints of numbness, tingling, or nerve pain affecting her extremities, but the claimant generally has normal sensation in the upper and lower extremities[.]"  Id. at 80 (citing T. at 405, 482, 519, 528, 595, 597).  The ALJ explained that plaintiff's "own calculations of up to one inch leg-length discrepancy are not always seen on physical exams, likely because of the use of left heel wedge for proper alignment.  The claimant generally has full 5/5 motor strength in the upper and/or lower extremities[.]"  Id. (citing T. at 405, 441, 509, 554, 606).  "Repeat exams show normal reflexes.  Not all exams show positive Tinel signs, hyperextension, or abnormal finger adduction affecting her upper extremities.  Finger dexterity is generally intact with full 5/5 grip strength or good grip strength[.]"  Id. (citing T. at 405, 528).  Finally, the ALJ stated that "[a]t times she has full range of motion of her lower extremities.  Any remaining positive clinical findings on physical exam not already identified are not seen on repeat exams and/or noted by various different medical sources."  Id. (citing T. at 528).

The ALJ stated that "[t]he remaining medical opinions of the claimant's urologist, Alexandria Lynch, M.D., dermatologist, Alice  Pentland, M.D., podiatrist, Brian Timm, DPM, family nurse practitioner, Jennifer Brenner, FNP-C, and mental health care provider, Lydia Smith, LCSW-R, are not persuasive."  T. at 81 (citing T. at 468-78, 616-22, 690-91).  As to plaintiff's physical limitations, the ALJ stated that "the additional

28

exertional and postural limitations identified by the claimant's own medical sources are inconsistent with the scant chronically positive clinical findings, including the lack of abnormal sensation, reflexes, and strength in her lower extremities on repeat physical exams." Id. at 82 (citing T. at 621-22).  The ALJ noted that "many of the opinions or assessments amount to a 'check box' form without referral to clinical or diagnostic finding or narrative explanation for the limitations that were provided." Id.  The ALJ stated that "the limitations appear to be based primarily on the claimant's subjective self-reports of symptoms and functional limitations that are inconsistent with the evidence for the reasons outlined above, including (but not limited to): the claimant's overall positive response to conservative treatment and her engagement in activities consistent with the full range of sedentary work." Id.

The ALJ proceeded to review the evidence related to (1) balancing, bending, climbing, kneeling, or squatting limitations; (2) reaching, writing, and handling limitations; (3) environmental limitations; (4) lifting and carrying limitations; and (5) standing, walking, and sitting limitations.  See T. at 82-84.  Specifically, as it relates to Dr. Pradhan's opinion, the ALJ stated that he "adopts the limitations for lifting and carrying a maximum of 10 pounds and standing or walking no more than two hours total in an eight-hour workday, which fully account for observations in the record of pain, fatigue, and other physical symptoms." T. at 83.  The ALJ proceeded to explain why greater limitations, beyond a limitation to sedentary work, were not warranted, but did not address why Dr. Pradhan's medium work limitations were inconsistent with the record.  See id. at 83-84.

It is entirely unclear how Dr. Pradhan's opinion, limiting plaintiff to medium work, could be "persuasive" where Dr. Pradhan did not examine plaintiff; the opinion did not provide any limitations consistent with the ALJ's RFC determination; and the records that Dr. Pradhan did not review indicate limitations and examination findings that contradict the entire opinion.  T. at 79; see Rodriguez, 2022 WL 3211684, at *15 (explaining that the plaintiff's "shoulder issues" "caused some additional limitations" but "[t]he ALJ [] observed" that examinations subsequent to the allegedly stale opinion "were unchanged" and the opinion was "consistent with the evidence pertaining to his back and lower extremity issues"); Jeffery M., 2020 WL 3637646, at *8 (emphasis added) ("The Court [] cannot find that the ALJ relied on 'stale' portions of the consultative examination, since he acknowledged that [the p]laintiff's medical condition had evolved between and after the two examinations, cited medical evidence that explained the changing state of [the p]laintiff's shoulder, and relied on those portions of the opinions that addressed medical conditions that still remained fairly consistent during the relevant time.").  There is no portion of Dr. Pradhan's opinion that is consistent with the ALJ's RFC determination.  See T. at 76, 143-44.

The ALJ's consideration of Dr. Pradhan's opinion is especially problematic as he stated that Dr. Pradhan conducted a "comprehensive review of the record[.]"  T. at 79.  However, Dr. Pradhan reviewed approximately twelve out of over four hundred pages of records.  See Dkt. No. 18 at 7.  Of particular concern are the records reflecting plaintiff's "foot pain with pes planus left foot plantar fasciitis . . ., right tibial tendonitis, lumbar spondylolisthesis, and Ehlers-Danlos Syndrome type 3" and the related symptoms and limitations.  T. at 69.  These are impairments that the ALJ found to be severe, and which

Dr. Pradhan did not consider.  See Maxwell H. v. Comm'r of Soc. Sec., No. 1:19-CV-0148 (LEK/CFH), 2020 WL 1187610, at *5 (N.D.N.Y. Mar. 12, 2020) ([The p]laintiff was not diagnosed with schizophrenia, schizophreniform disorder, or schizoaffective disorder or until after" the consultative examination and "the Court finds these new diagnoses especially salient in this case because the ALJ himself found that schizoaffective disorder was one of [the p]laintiff's severe impairments and opined that this diagnosis was one of the most 'commonly seen' in the record.").

Despite the ALJ's discussion of the evidence, it was improper for the ALJ to rely on Dr. Pradhan's opinion as it was based on a review of only two X-rays and the consultative examination, and the findings were inconsistent with the entirety of the record.  To the extent the ALJ stated that the opinion was persuasive because it indicated that plaintiff could not perform heavy or very heavy work, this says nothing about the inconsistencies between sedentary and medium work.  See T. at 79.  The ALJ did not discuss how the subsequent evidence impacts the persuasiveness of Dr. Pradhan's opinion, that Dr. Pradhan did not review the vast majority of the treatment records, and that Dr. Pradhan never examined plaintiff.  See id.  Accordingly, the ALJ's consideration of Dr. Pradhan's opinion is not supported by substantial evidence.  Id.; see Biro v. Comm'r of Soc. Sec., 335 F. Supp. 3d 464, 471 (W.D.N.Y. 2018) (determining that the ALJ's consideration of the plaintiff's knee impairment was not supported by substantial evidence because the opinion that the ALJ accorded significant weight was rendered before the plaintiff's knee injury and surgeries, and although the ALJ discussed the "worsening" of the plaintiff's knee problems, the ALJ discounted the two opinions that were rendered after the knee injury).

31

As to Dr. Jenouri's consultative examination opinion, the Commissioner does not respond to plaintiff's argument that it is impermissibly "vague" but states that the ALJ relied on "[t]he objective findings and <u>non-specific</u> opinion of Dr. Jenouri[.]"  Dkt. No. 18 at 6 (emphasis added); Dkt. No. 13 at 19-20.  "Although a consultative examiner's opinion may use terminology that, on its face, is vague, such language does not render the consultative examiner's opinion useless in all situations."  <u>Monroe v. Comm'r of Soc. Sec.</u>, No. 5:15-CV-1235 (GTS/WBC), 2016 WL 7971330, at *7 (N.D.N.Y. Dec. 29, 2016), <u>report and recommendation adopted</u>, 2017 WL 318838 (N.D.N.Y. Jan. 23, 2017) (citation omitted).  "[C]ourts have held that a consultative examiner's conclusion was not impermissibly vague where the conclusion was 'well supported by his extensive examination.'"  <u>Id.</u> at *8 (quoting <u>Waldau v. Astrue</u>, No. 5:11-CV-925, 2012 WL 6681262, at *4 (N.D.N.Y. Dec. 21, 2003) (additional citation omitted).  "Courts have also held that medical source statements from consultative examiners which provide vague language may be rendered 'more concrete' by the facts in the underlying opinion and other opinion evidence in the record."  <u>Id.</u> (collecting cases) (citations omitted).

Here, Dr. Jenouri's conclusion is supported by his examination in which plaintiff had a normal gait; fifty-percent squat; she could walk on her heels and toes with difficulty; she did not need assistance during the examination; she had full ranges of motion in her cervical spine, shoulders, elbows, forearms and wrists; limited ranges of movement in her lumbar spine, hips, knees, and ankles; full strength in the upper and lower extremities; no muscle atrophy; intact dexterity; and full grip strength.  <u>See</u> T. at 404-405.  The opinion is also consistent with Dr. Pradhan's conclusion that plaintiff could walk for six hours in an eight-hour day, as well as records which, as plaintiff

explains, reflect pain with walking, standing, bending, and prolonged activity.  See T. at 144; see also Dkt. No. 13 at 15-16 (citing T. at 499, 575, 581); cf. Benedetto L. v. Saul, No. 19-CV-1284F, 2021 WL 1110407, at *5 (W.D.N.Y. Mar. 23, 2021) (collecting cases) (citations omitted) ("[A]n RFC determination that a disability claimant can perform 'light work'[—which requires the ability to stand and walk for up to six hours—]has repeatedly been found consistent with a 'mild' limitation to sitting, standing, and walking.").

As such, it is not reversible error for the ALJ to rely on Dr. Jenouri's "vague" conclusion.  See Riederer v. Comm'r of Soc. Sec., 464 F. Supp. 3d 499, 505 (W.D.N.Y. 2020) (explaining that the ALJ found the consultative examiner's opinion to be "consistent with his examination of [the p]laintiff and largely supported by the generally unremarkable longitudinal medical record.  Nonetheless, affording [the p]laintiff the benefit of the doubt and taking into account the fact that the objective diagnostic imaging did show degenerative disc disease, the ALJ assessed a more restrictive RFC finding.").  However, as plaintiff states, Dr. Jenouri's opinion is inconsistent with the opinions from plaintiff's treating providers who opined greater limitations.  See T. at 47, 469, 621.  Additionally, Dr. Jenouri examined plaintiff once, he did not review any treatment records, and he was not aware of plaintiff's Ehlers-Danlos diagnoses or lumbar spondylolisthesis assessment.  See Dkt. No. 13 at 19.

Dr. Pradhan reviewed an incomplete record, Dr. Jenouri examined plaintiff once and did not review any medical treatment records, and the ALJ rejected every treating providers' opinion.  See T. at 81-82, 143-44, 403.  Specifically, the ALJ rejected the only medical opinion which considered plaintiff's Ehlers-Danlos Syndrome—Dr. Timm's opinion.  See T. at 621-22; see also M.-M., v. Kijakazi, No. 5:21-CV-14, 2022 WL

1223202, at *17 (D. Vt. Apr. 26, 2022) ("[T]he ALJ rejects the only medical opinion attesting to absences due to medical impairments in the record and substitutes his own opinion about medical absences. Because the ALJ may not substitute his own opinion for that of a medical source, and there is no medical source found fully or partially persuasive in the record other than Dr. Bannach who provided an opinion on absences per month due to impairments, the ALJ should not have disregarded this opinion.").

This left the ALJ with plaintiff's treatment records which he determined did not support greater limitations because although there were "some positive laboratory findings[,]" plaintiff did not have muscle spasms, trigger points, range of motion limitations, swelling, edema, or effusions at every follow-up visit.  T. at 80 (citations omitted); see Russ v. Comm'r of Soc. Sec., 582 F. Supp. 3d 151, 163 (S.D.N.Y. 2022) (explaining that "the non-examining consulting doctor" "did not review [the plaintiff's] records for the entire time period between August 21, 2018[,] and when the ALJ rendered his decision on September 30, 2019.  In that period, [the plaintiff] regularly saw her pain management treaters . . . .  The ALJ thus had no opinion from any medical source, treating or otherwise, as to the significance of the additional records or their implication for [the plaintiff's] functional abilities.  Yet, those records suggest chronic pain in multiple parts of the body of a varying but generally high degree.").  Dr. Salim's medical source statement and Broome County disability assessment, which were submitted to the Appeals Council, also explicitly rely on plaintiff's Ehlers-Danlos syndrome, and have similarly severe limiting conclusions as Dr. Timm's opinion.  See T. at 33-34, 47; see also Badillo v. Berryhill, No. 18-CV-08414 (ER), 2020 WL 1528118, at *9 (S.D.N.Y. Mar. 31, 2020) ("Having assigned little or no weight to the opinions of all of

[the plaintiff's] treating sources . . . the ALJ had little affirmative evidence on which to rely in making his assessment."); Leslie H. L. v. Comm'r of Soc. Sec. Admin., No. 3:21-CV-00150 (SALM), 2021 WL 5937649, at *6 (D. Conn. Dec. 16, 2021) (citations omitted) ("Rather than relying on any expert medical opinion or functional assessment, the ALJ relied on treatment notes, which he characterized as 'generally benign.'  This characterization is not found in any of the medical opinions; it is entirely the ALJ's own assessment. . . .  By labeling the medical opinions as unpersuasive, the ALJ effectively gave them no weight.  By giving each of these opinions no weight, the ALJ was left with no medical opinion on which to act and, by default, substituted his own medical judgment.").

To be sure, an ALJ's RFC determination does not need to mirror any one medical opinion, and an RFC determination can be supported by substantial evidence absent a medical opinion.  See Todd E. O. v. Comm'r of Soc. Sec., No. 5:20-CV-1046 (CFH), 2022 WL 326629, at *13 (N.D.N.Y. Feb. 3, 2022) (collecting cases to support the contention that an ALJ's RFC determination does not need to mirror, or be based on, any one medical opinion to be supported by substantial evidence).  However, plaintiff raises two specific issues with the ALJ's RFC determination, arguing that it is not supported by a medical opinion or the record: (1) the need for plaintiff to change positions and elevate her legs; and (2) her ability to stay on task and attend work.  See Dkt. No. 13 at 22-26.  The Court finds error on both grounds that warrant remand.

### 2.  Plaintiff's Need to Elevate her Legs or Change Positions

Plaintiff argues that "the ALJ improperly substitutes his judgment for that of the undisputed medical opinions on the issues of the need to change positions and/or

elevate the feet." Dkt. No. 13 at 26.  The Commissioner responds to this argument in a footnote, stating that "[t]he ALJ was entitled to consider the entire record" and conclude that a limitation concerning plaintiff's need to elevate her legs was not supported by the record. Dkt. No. 18 at 16-17, n. 5.  The Commissioner argues that "[p]laintiff makes an entirely procedural argument, without citation to  the medical record (which shows very limited findings of edema in the lower extremities), and this Court should [] affirm on this point[.]"  Id. at 17, n.5

Dr. Timm determined that based on plaintiff's Ehlers-Danlos syndrome plaintiff would need to elevate her legs for forty to fifty percent of a workday.  See T. at 469, 621.  Dr. Salim opined that based on plaintiff's Ehlers-Danlos syndrome and "[p]ain in multiple body regions (leg, feet, back, ankles, shoulders, elbows, hands)[,]" she would need to elevate her feet for six hours in an eight-hour day and would need to change positions every zero to five minutes to relieve discomfort.  T. at 34, 47.

The ALJ stated that "[t]here are no chronic findings for lymphedema, redness, heat, edema, swelling, or effusion of the extremities to support the need to elevate her legs up to 50% of the workday as identified by the podiatrist.  At times, the claimant reports that she normally has no swelling or edema of her legs[.]"  T. at 82 (citing T. at 405, 519, 528, 559-60, 595, 597, 631).  The ALJ noted plaintiff's testimony that she can stand for thirty minutes at a time and would need to sit for fifteen minutes before she could stand up again.  See T. at 83, 118.  The ALJ stated that "[a]lthough there are periodic complaints, records from the medical sources do not reflect chronic complaints of difficulty with prolonged sitting . . . ."  Id. at 84.  The ALJ explained that plaintiff's "allegations of the need to elevate her legs for at least a few hours per day are not

reflected in physical exams.  Despite the claimant's allegations of chronic swelling from hips to feet on almost a daily basis or periodic notations of 'ongoing' lymphedema of her leg various physical exams fail to show findings for recurrent lymphedema."  Id. (citing T. at 416, 433, 451, 631).  The ALJ stated that "[t]here are periodic complaints of numbness, tingling, or nerve pain affecting her extremities, but the claimant generally has normal sensation in the upper and lower extremities[.]"  Id. at 80 (citing T. at 405, 519, 528, 559-60, 595, 597, 631).  The ALJ also concluded that "[t]he need to periodically change positions outside of the residual functional capacity can be accommodated by regular breaks during a typical 8-hour workday, 40-hour work week, or equivalent schedule."  Id. at 84.  The ALJ explained that the need to change positions was also not supported by objective medical evidence because plaintiff did not use an assistive device, and she had normal station and gait in some examinations.  See id. at 83 (citing T. at 118, 404, 589, 631).

In a treatment note, Dr. Salim explained that symptoms of Ehlers-Danlos syndrome have "clinical variability" but that "[c]hronic pain, distinct from that associated with acute dislocations, is a serious complication of the condition. . . .  Chronic fatigue and autonomic dysfunction may also be seen . . .  Psychological dysfunction, psychosocial impairment, and emotional problems are common."  T. at 18.  Plaintiff testified that her feet, ankles, and legs swell; she cannot go shopping because of the pain and swelling in her lower extremities; and she has to elevate her feet at least once a day, every day, for a few hours.  See T. at 117, 131-33.  During the hearing, the ALJ read a medical note into the record which stated that plaintiff "denie[d] any specific swelling of her joints but does complain of chronic edema in the lower extremities. . . ."

Id. at 128, 530.  The ALJ clarified, "[e]dema is swelling, which I take it you know."  Id. at 128-29.  The ALJ did not proceed to read the assessment from that same treatment note during the hearing, or cite in his decision, that an "MRI of the left foot/ankle revealed edema[.]"  Id. at 532.

Additionally, throughout the record, plaintiff consistently complained of pain and swelling, weakness, antalgic gait, and muscle spasms were noted.  See T. at 16-18, 414, 441-43, 446, 451, 453, 455,461, 463, 499, 512, 571, 575, 577, 581, 606, 728-29.  There is nothing in the record to indicate that the relevant symptoms of Ehlers-Danlos, or any of plaintiff's other impairments, that would likely cause the need to elevate her legs or change positions, must be consistent swelling, edema, or effusions, and that those symptoms must appear on every examination.  See Marrero Santana v. Comm'r of Soc. Sec., No. 17-CV-2648 (VSB/BCM), 2019 WL 2330265, at *12 (S.D.N.Y. Jan. 17, 2019), report and recommendation adopted, 2019 WL 2326214 (S.D.N.Y. May 30, 2019) (reversing the ALJ's decision, in part, because "the ALJ rejected Dr. Rodriguez-Ospina's opinions in part because the 'claimant generally [did] not manifest signs of significant joint instability, swelling, sensory deficits, weakness, or muscle atrophy.' . . . [T]he ALJ did not identify any medical opinion evidence (nor was there any) suggesting that the absence of the other three signs ('significant joint instability,' 'swelling,' and 'muscle atrophy') were inconsistent with Dr. Rodriguez-Ospina's conclusions concerning [the] plaintiff's diagnoses or his functional limitations, which were based on a different list of symptoms, including 'Reduced range of motion,' 'Muscle spasm,' 'Abnormal gait,' 'Reflex loss,' and 'Tenderness').").

Rather, the ALJ substituted his own opinion for that of plaintiff's medical providers who determined that plaintiff's symptoms and examination findings were consistent with her diagnoses and caused the opined limitations.  Specifically, the ALJ stated that "most of the claimant's treatment is primarily related to chronic disorders of her lumbar spine, ankles, and feet."  T. at 79 (citations omitted).  This chronic pain is consistent with the treatment note describing the symptoms Ehlers-Danlos syndrome.  See id. at 18.  The providers then based their opinions as to plaintiff's need to elevate her legs and change positions on her Ehlers-Danlos syndrome.  See id. at 33-34, 47, 621.

This case is similar to Drabczyk v. Comm'r of Soc. Sec., No. 18-CV-355 (FPG), 2020 WL 4390701 (W.D.N.Y. July 31, 2020).  In Drabczyk, "[t]he ALJ's justification for the little weight assigned to opinions of both providers was rooted in her conclusion that [the providers'] opinions were inconsistent with the medical record, which, in turn, contained very few objective findings."  Id. at *4.  The court determined that the ALJ's "conclusion was erroneous because [the providers'] diagnoses of [the p]laintiff's impairments and their opinions as to [the p]laintiff's physical limitations stemming from such impairments were consistent with conclusions and diagnosis of numerous specialists [the p]laintiff saw during pendency of her applications."  Id.  The court proceeded, explaining that the plaintiff's "physical examinations were mostly unremarkable.  Despite that, [the providers], [and] the specialists [the p]laintiff saw, diagnosed [her] with POTS, Ehlers-Danlos syndrome, IBS, severe diarrhea, chronic migraines, and other severe impairments, noted her debilitating symptoms associated

with these impairments, and, at the very least, prescribed medications to treat her symptoms." Id. (citations omitted).

The Drabczyk court also noted that "[t]he complexity of [the p]laintiff's impairments has also resulted in [the p]laintiff's referral to a variety of specialists, and eventually to Cleveland Clinic for a consultation about [the p]laintiff's abnormal insufficiency/dysautonomia syndrome because of the lack of specialists that could deal 'with her constellation of symptoms.'" 2020 WL 4390701, at *4 (footnote and citation omitted) (citing Soc. Sec. Ruling 16-3p ("SSR"): Titles II & Xvi: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *8 (S.S.A. Mar. 16, 2016) ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.")).  The court also criticized the ALJ's reliance on the "[p]laintiff's ability to perform household activities, such as shopping, was also flawed because [the] plaintiff's ability to perform certain activities outside the house is a very weak basis for the ALJ's rejection of the treating source opinion, because all of the activities that [the p]laintiff could do were performed at a rate other than eight hours a day, five days a week." Id. at *5 (quoting Kelsey O. v. Comm'r of Soc. Sec., 3:17-CV-525 (ATB), 2018 WL 3193197, at *6 (N.D.N.Y. June 28, 2018)) (internal quotation marks omitted).

Here, the ALJ concluded that all of plaintiff's treating providers' opinion were "not persuasive" because "[a]t times, [she] reports that she normally has no swelling or edema of her legs"; there were "scant chronically positive clinical findings, including the

lack of abnormal sensation, reflexes, and strength in her lower extremities on repeat physical exams[]"; and plaintiff's "overall positive response to conservative treatment and her engagement in activities consistent with the full range of sedentary work."  T. at 82 (citations omitted).  First, the ALJ cited to a single record to support the contention that plaintiff reported "that she normally has no swelling or edema of her legs[.]"  Id. (citing T. at 559-60).  The citation is to an Emergency Department Report in which plaintiff presented with "acute onset of bilateral leg swelling . . . .  The patient normally has no swelling of the legs or edema."  Id. at 559.  However, the record is from 2008 and since that time, plaintiff reported swelling in her legs or edema.  See id. at 442, 451, 559, 729.

Second, as explained, there is no indication in the record that plaintiff had to show signs of "abnormal sensation, reflexes, and strength" or edema and swelling during her examinations to support a need to elevate her legs or change positions.  T. at 82; cf. Laura B.-F. v. Comm'r of Soc. Sec., No. 2:17-CV-146, 2018 WL 9651144, at *6 (D. Vt. June 20, 2018) (explaining that the ALJ determined that opinions were of "limited weight" because they were "inconsistent" with records showing "good strength and range of motion" but "there is ample evidence supporting these opinions, including [] treatment notes of . . . as well as those of multiple other treating medical providers" which showed degenerative changes, arthritis, obesity, tender points, and a fibromyalgia diagnosis).  Rather, the record indicates that plaintiff consistently had one or more symptoms and examination results indicating pain, swelling, hypermobility of the joints, tenderness, muscle spasms, and range of motion limitations.  See T. at 415, 418, 442, 446, 449, 451-52, 461, 511, 513, 518, 571, 575, 577-78, 581, 606, 686, 728,

41

730.  Plaintiff saw numerous providers for her variety of impairments including a
dermatologist, orthopedist, rheumatologist, pain management provider, and urologist;
and was prescribed medications and attempted physical therapy to aid her symptoms.
See id. at 421, 499-500, 523, 575, 578, 629, 685, 731.  Plaintiff was also referred to a
neurologist because her pain made her unable to sleep or get more than four hours of
sleep.  See id. at 508.  As a result of these symptoms and impairments, plaintiff's
providers concluded that she needed to elevate her legs and adjust her position.  See T.
at 34, 47, 469, 621.

Moreover, the ALJ noted that plaintiff was not more limited, in part, because of
her ability to "engage[] in activities consistent with the full range of sedentary work."  T.
at 82.  Earlier in his decision, the ALJ listed these activities as "engaging in a range of
activities on a regular and continuing basis, including (but not limited to): showering and
dressing, folding laundry, occasionally cleaning to include toilets and sinks, vacuuming,
dusting, shopping in stores some days or 'occasionally[,]' putting groceries away, driving
a vehicle, and attending scheduled medical appointments[.]"  Id. at 78 (citing T. at 271,
273-74, 400, 404).  Although an ALJ is entitled to consider a plaintiff's activities of daily
living, see Cherry v. Comm'r of Soc. Sec. Admin., 813 F. App'x 658, 662 (2d Cir. 2020)
(summary order), none of these activities equate to an ability to sit for an eight-hour day,
not change positions, and not elevate one's legs.  See Green v. Saul, No. 18-CV-02857
(JGK/KHP), 2019 WL 2996502, at *9 (S.D.N.Y. June 19, 2019), report and
recommendation adopted, 2019 WL 2992088 (S.D.N.Y. July 9, 2019) (citations omitted)
("[The p]laintiff took an 11-hour tra[in] ride on holiday, which is in sharp contrast to [the
doctor's] assessment that she could only stand or sit 1/3 of a work day.  [The p]laintiff

has been to multiple church retreats that have lasted through the weekend and required a three-hour drive.").

Based on the foregoing, the Court cannot conclude that the ALJ's RFC determination, limiting plaintiff to sedentary work with no additional physical restrictions, is supported by substantial evidence where the state agency consultant reviewed an incomplete record, the consultative examiner examined plaintiff on one occasion and did not review any records, the ALJ found every treating provider opinion to be "unpersuasive[,]" the ALJ inappropriately relied on plaintiff's activities of daily living, and the ALJ inserted his own opinions as to the specific type of findings that needed to be shown on examination in order to substantiate the providers' opinions.

### 3. Time Off Task/Absenteeism

Plaintiff argues that "[t]he ALJ fails to properly assess limitations to staying on task and/or maintaining attendance and in so doing improperly substitutes his judgment for that of undisputed medical testimony." Dkt. No. 13 at 22. Plaintiff states that "every opinion to address the issues of work pace and/or attendance f[ound] limitations in that regard but the ALJ, nonetheless, does not include any such limitations in the RFC." Id. at 23. Plaintiff asserts that "[t]he ALJ does not point to any contrary opinion and his reasoning is not overwhelmingly compelling." Id.

The Commissioner asserts that the opinions concerning plaintiff being off task of absent from work "vary substantially between themselves, both in the assessed limitations and the relevant diagnoses." Dkt. No. 18 at 14. Specifically, the Commissioner notes that Ms. Brenner would assess severe absenteeism and off-task limitations based on 'chronic insomnia' and 'excessive fatigue'"; "Alice Pentland, M.D.,

would assess similarly severe absenteeism and off-task limitations based on dermatitis and neurodermatitis"; "[a]nd Alexandria Lynch, M.D. would assess similarly severe absenteeism and off-task limitations based on 'overactive bladder[.]'" Id. (quoting T. at 477-78, 625-26; citing T. at 473-74).  The Commissioner argues that the opinions do not "contain[] narrative content or detail to explain the assessed off-task/absenteeism limitations."  Id.

In their medical opinions, Dr. Timm twice indicated that plaintiff would be off task for more than thirty-three percent of a workday and miss more than four days of work per month; Dr. Pentland twice indicated that plaintiff would be off task for more than fifteen percent, but less than twenty percent, of a workday and miss three or four days of work per month; Dr. Lynch determined that plaintiff would be off task between ten and fifteen percent of a workday and would miss three days of work per month; Dr. Salim opined that plaintiff would be off task for more than thirty-three percent of a workday and miss more than four days of work per month; and LCSW-R Smith determined that plaintiff would be off task for more than thirty-three percent of a workday and miss more than three days of work per month.  See T. at 33-34, 470, 473-74, 478, 618, 622, 691. Amanda Slowik, Psy.D., the psychiatric consultative examiner, determined that plaintiff had moderate to marked limitations in sustaining an ordinary routine.  See id. at 400.

At step two, in determining that plaintiff's mental impairments were not severe, the ALJ concluded that the "opinion of consultative examiner, Amanda Slowik, Psy.D., finding moderately or moderately-to-markedly limited ability in multiple areas, is not persuasive."  T. at 72 (citing T. at 397-401).  "The opinion was based on only single exam of the claimant and the significant limitations identified are not well-supported by

the scant clinical findings on accompanying mental status exam, the claimant's level of treatment, or her activities of daily living as reflected in the same report." Id.  The ALJ also stated that "the medical opinions and/or assessments of the claimant's own medical sources indicating significant off-task behavior, diminished concentration, diminished work pace, need for extra rest periods, and/or excessive absences secondary to cognitive effects of physical pain or side-effects of medications are not persuasive . . . ." Id. (citing T. at 473-78, 621-26, 690-91).  The ALJ explained that the "opinions/assessments are not well-supported by the scant chronically positive clinical findings outlined above and are inconsistent with observations that the claimant appears awake, alert, and/or in no acute distress." Id.  "Significant absences and off task behavior are speculative, particularly as the claimant does not have a history of multiple cancelled medical appointments to indicate difficulty attending to a routine or maintaining a schedule.  [She] is not involved in the type of aggressive medical treatment that would require multiple absences []." Id.  "Additionally, the limitations in maintaining attention and concentration are inconsistent with the results of mental status examinations performed by various medical sources and the claimant's engagement in a range of activities on a regular basis that involve good attention, concentration, and memory skills." Id. at 72-73.

In determining plaintiff's RFC, the ALJ concluded that Drs. Timm, Pentland, and Lynch's, and LCSW Smith's medical opinions were "not persuasive." T. at 81.  In relevant part, the ALJ stated that "the claimant's own medical sources indicated that the claimant would experience diminished work pace and would need to rest at work, but the off-task behavior could be accommodated by regular breaks and lunch period during

a normal workday[.]" Id. (citing T. at 469-74, 621-26, 690-91). The ALJ noted that "Dr. Lynch specified that the claimant would not experience diminished work pace or the need for extra rest periods at work[.]" Id. (citing T. at 478). The ALJ explained that "[f]requent absences from work or difficulties maintaining regular attendance as identified by the claimant's own medical sources are not supported by the claimant's engagement in a range of activities of daily living on a regular and continuing basis. The claimant does not have a history of multiple cancelled medical appointments to indicate difficulty attending to a routine or maintaining a schedule." Id. (citing T. at 469-78, 621-26, 690-91). The ALJ stated that plaintiff "the claimant's bladder conditions are under good medical control that fail to support the need for unlimited access to the restroom, close proximity to a restroom, frequent restroom breaks to take the claimant off task, or other limitations." Id. at 82. "The claimant did not require a restroom break during the lengthy face-to-face interview at the Field Office in December 2017 or the disability hearing held in October 2019. Her urologist did not always identify the need for extra breaks to use the restroom outside of typical breaks and lunch periods[.]" Id. (citing T. at 477-78). The ALJ also discounted the opinions because they were check-box forms and "the limitations appear to be based primarily on the claimant's subjective self-reports of symptoms . . . ." Id.

In a paragraph separate from the ALJ's consideration of the medical opinions, the ALJ "note[d] that the record does not support limits in production rate pace, frequent unscheduled breaks, excessive absenteeism and tardiness, need to leave early from work, or other significant off-task behavior in a work-setting secondary to the claimant's physical impairments." T. at 84. "Specifically, the claimant alleged that she was

previously fired due to absenteeism, but prior problems with attending work do not represent the maximum residual functional capacity as they predate the period at issue before the undersigned or the work involved greater physical demands than are contemplated in this case." Id. (citing T. at 111).  The ALJ stated that "[t]he combination of the claimant's severe and non-severe impairments have been considered in determining the claimant's maximum residual functional capacity, but the remaining non-severe physical impairments are all under good medical control with use of medication, diet modification, and other conservative measures." Id.  "The claimant's allegations of off-task behavior due to pain and side-effects of medications are not supported by the various exams that show the claimant appears awake/alert and in no acute distress []." Id.  The ALJ also explained that "[a]lthough there are periodic gaps in treatment or cancelled medical appointments, the claimant was able to attend other scheduled appointments without difficulty, including the two consultative examinations, the disability hearing, and routine follow-up exams with her own medical sources, that fail to support frequent absences from work." Id.  Finally, the ALJ stated that "the claimant has been able to perform a range of activities on a regular and continuing basis, including caring for her own personal needs and performing a range of household chores." Id.

The overwhelmingly compelling standard states that "the ALJ is merely a fact-finder and, as such, has no ability to disregard a medical opinion without a contrary medical opinion or an overwhelmingly compelling circumstantial critique." Amy C. v. Comm'r of Soc. Sec., No. 3:20-CV-0546 (ML), 2021 WL 1758764, at *8 (N.D.N.Y. May 4, 2021) (quoting Wagner, 906 F.2d at 861).  "[T]he ALJ cannot arbitrarily substitute his

own judgment for competent medical opinion." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citation omitted).  "A circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." Amy C., 2021 WL 1758764, at *9 (citation omitted).  "As recently as March 2020, the Second Circuit reiterated application of this standard." Karen S. v. Comm'r of Soc. Sec., No. 3:20-CV-960 (CFH), 2022 WL 462086, at *7 (N.D.N.Y. Feb. 15, 2022) (citing Riccobono v. Saul, 796 F. App'x 49, 50 (2d Cir. 2020) (summary order) ("And while the ALJ may have given appropriate reasons for not according controlling weight to some of the opinions of [the plaintiff's] treating physicians, she must still base her conclusion on some medical opinion or otherwise articulate the overwhelmingly compelling reasons for not doing so.")).  This Court has clarified that, "[t]o the extent that the 'overwhelmingly compelling' standard remains applicable to cases governed by the amended regulations for assessing opinion evidence, it is well-established that it only applies where the medical opinion evidence is 'uncontradicted.'" Maria C. T. v. Comm'r of Soc. Sec., No. 5:20-CV-1521 (DEP), 2022 WL 2904367, at *5 (N.D.N.Y. July 22, 2022) (quoting Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009) (summary order)) (explaining that "Dr. Grassl opined a marked limitation in [the] plaintiff's ability to sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior, and maintain wellbeing. . . .  Dr. Walker, in his worksheet, noted that [the] plaintiff is at most 'moderately limited' in any similar areas of functioning . . . .  Because the opinions of Dr. Grassl and Dr. Walker do not describe the same degree of limitation, they are not 'uncontradicted' and thus do not implicate the need for an overwhelmingly compelling reason to justify the ALJ's choice not to adopt them.").

The Commissioner does not respond to plaintiff's argument that the opined off-task and absenteeism limitations are not contradicted by a medical opinion and that the ALJ's analysis does not provide overwhelmingly compelling reasons to reject the various medical opinions' conclusions.  See Dkt. No. 13 at 23; Dkt. No. 18 at 14-17; Dkt. No. 20-1 at 3-4.  Rather, the Commissioner argues that the treating providers' opinions are inconsistent with each other as they base their opinions on different diagnoses and the opinions are worth less weight because they are all check box forms.  See Dkt. No. 18 at 14-16.  The Commissioner also does not address Dr. Slowik's consultative examination conclusion that plaintiff had moderate to marked limitations in sustaining an ordinary routine.  See generally Dkt. No. 18.  "[T]he Commissioner urges to this court to rely on the same reasoning contained in its decision in Tamara M. v. Saul."  Id. at 16.  In Tamara M., the Court explained that the plaintiff's treating provider

> used two check box forms to assert that [the] plaintiff's physical and mental limitations each would cause [the] plaintiff to be off task for 33% of the work day and absent more than four days per month.  Although the forms requested [the provider] to explain her basis for the restrictions opined, she merely referred to [the] plaintiff's diagnoses without further explanation.  This Court has held that where treating physicians use check-box assessment forms that do not explain how they reached these limitations and the treatment notes do not support those limitations, the treating physicians' opinions were reasonably accorded less weight. . . . As [the provider] did not explain in the medical source statements (despite that question being asked of counsel via the questionnaire form) the available medical information she relied on in concluding that [the] plaintiff would be off task 33% of the day due to mental and physical impairments and absent more than four days per month, the ALJ reviewed the medical record and reasonably concluded that it did not reveal objective medical evidence supporting such significant limitations.

3:19-CV-1138 (CFH), 2021 WL 1198359, at *8-9 (N.D.N.Y. Mar. 30, 2021) (collecting cases) (citations omitted).

The Second Circuit has recently explained that it was "unable to discern any such rule, either in our case law or in relevant federal regulations[]" that stood for the proposition "that an ALJ may discount a treating physician's medical opinion in the determination of disability benefits if the opinion is provided in a check-box form." Colgan v. Kijakazi, 22 F.4th 353, 361 (2d Cir. 2022).  The Court reiterated its determination from Halloran, where "the disability claimant had relied on a check-box opinion completed by her treating physician which simply noted that the claimant was unable to take up sedentary work because she 'could sit for less than 6 hours per day[.]'" Id. (quoting Halloran, 362 F.3d at 31-32).  The Court explained that "[b]ecause the treating physician's check-box opinion was unsupported by substantial medical evidence, including the opinions of other medical experts, and 'not particularly informative,' we agreed with the ALJ's decision not to grant controlling weight to the physician." Id. (quoting Halloran, 362 F.3d at 31-32).  The Colgan Court determined, however, that in its case, the provider's "check-box form opinion was supported by voluminous treatment notes gathered over the course of nearly three years of clinical treatment.  In light of these circumstances, then, the ALJ's [] reason for assigning little weight to [the] opinion was erroneous." Id. at 362 (footnote omitted).

Here, although the medical providers completed check box forms, that alone, is an insufficient reason to discount the opined limitations.  See T. at 469-78, 617-26; see Colgan, 22 F.4th at 361-62.  Rather, the ALJ should look to all of the evidence in the record to determine if their opined limitations are supported.  See Kimberly W. v. Kijakazi, No. 6:20-CV-925 (DJS), 2022 WL 561665, at *4 (N.D.N.Y. Feb. 24, 2022)

(citation omitted) ("[I]f the opinion is substantiated by clinical findings and other evidence in the record, the format of the opinion should not affect the weight to be given.").

The Commissioner states that some of the medical opinions opining off task or absenteeism limitations "bear no relationship to the underlying treatment notes." Dkt. No. 18 at 17. The Commissioner provides one example, stating that Dr. Pentland's opinion is not supported by his single treatment note appearing in the record in which he prescribed plaintiff Allegra and he noted in his medical opinion that the medication caused "sleepiness[,]" despite no side effects being noted in the treatment record. Id. (citations omitted); see T. at 474, 552. However, Dr. Pentland indicated in his medical opinion that sleepiness "rarely" occurs from the medication and noted plaintiff's diagnoses as dermatitis and neurodermatitis. Id. at 473-74. Further, plaintiff's dermatology records indicate that she had a rash on her scalp, eyelids, and abdomen and she had "[s]cattered erythemic papules with excoriated areas noted on face, arms, chest, back and bilateral legs[.]" Id. at 422-23. Plaintiff was told apply a thick cream or Vaseline "twice daily to entire body." Id. at 424. Plaintiff stated that she scratched at the papules. See id. at 426. The ALJ did not discuss whether the dermatology records supported Dr. Pentland's conclusion that plaintiff's dermatitis and neurodermatitis would cause her to be off task or miss work. See id. at 71, 81-82, 84.

The ALJ stated that off task or absenteeism limitations are not supported by plaintiff's examinations showing that she is awake and alert and that "[a]lthough there are periodic gaps in treatment or cancelled medical appointments, the claimant was able to attend other scheduled appointments without difficulty, including the two consultative examinations, the disability hearing, and routine follow-up exams with her

own medical sources, that fail to support frequent absences from work." T. at 84. The ALJ also stated, without citation to the record, that plaintiff "is not involved in the type of aggressive medical treatment that would require multiple absences from work." Id. at 82.

Plaintiff submitted a letter to the SSA which explained that she had medical appointments throughout the entire week, every day of the week. See T. at 767. She also testified that she was fired from a previous job "because of [her] medical problems." Id. at 111. The ALJ asked if this was, "[d]ue to absenteeism because of your problems[,]" and plaintiff responded, "[y]es." Id. Although the ALJ acknowledged that she was fired, it is entirely unclear to the Court how that testimony and the letter to the SSA do not support the opined limitations. Additionally, the ALJ stated that plaintiff was able to attend the consultative examination but did not then acknowledge that the consultative examiner determined that plaintiff would have moderate to marked limitations sustaining an ordinary routine. See id. at 84, 397-98, 400.

To the extent the ALJ rejected the opined limitations because they are "based primarily on the claimant's subjective self-reports of symptoms and functional limitations[,]" "the Second Circuit has held that a doctor's reliance on subjective complaints does not necessarily undermine his opinion of the claimant's functional limitations." Bodoh v. Colvin, No. 5:14-CV-1004 (GTS), 2015 WL 5512442, at *5 (N.D.N.Y. Sept. 15, 2015) (citing Green-Younger v. Barnhart, 335 F.3d 99 (2nd Cir. 2003)). "That is particularly true in the case of mental health impairments[.]" Skartados v. Comm'r of Soc. Sec., No. 20-CV-3909 (PKC), 2022 WL 409701, at *9 (E.D.N.Y. Feb. 10, 2022). The ALJ also did not explain how plaintiff being awake, alert, or in no acute

distress has anything to do with her ability to stay on task for eight hours a day or attend a job for five days a week.  <u>See</u> T. at 72.  Rather, plaintiff's treatment notes indicate that she had isolative behaviors, she cannot think clearly or focus, that her pain affects her ability to concentrate and focus, she "typically gets 4 hours of sleep per night[]" and "there are times where she will go a few days without sleep and all[,]" she had "daytime somnolence[,]" and her pain is relieved, in part, by rest.  <u>Id.</u> at 385, 398, 416, 508, 514, 527, 575, 646.

Next, although the ALJ stated that plaintiff's bladder condition was under control, he did not explain whether plaintiff's pain, anxiety, or sleep problems as indicated in the record, would impact her ability to stay on task or attend a job.  <u>See</u> T. at 82.  Dr. Brenner, for example, explained that plaintiff would miss more than four days of work per month because of her chronic insomnia.  <u>See id.</u> at 625-26.  Additionally, the ALJ stated that plaintiff's "urologist did not always identify the need for extra breaks to use the restroom outside of typical breaks and lunch periods[.]"  T. at 82 (citing T. at 477-78).  The ALJ concluded that plaintiff's "off task" behavior could be accommodated by regular breaks in the workday.  <u>Id.</u> at 81.  In the medical opinion, Dr. Lynch checked "yes" for the following four statements: "[m]edical conditions suffered by the claimant would require unlimited access to the bathroom"; "[t]he need to use the bathroom could be accommodated in a job which allowed for a break in the morning, a break in the afternoon and a break for lunch"; "[t]he need to use the bathroom would be urgent and immediate"; and "[t]he need to use the bathroom would not be urgent and immediate and could be accommodated by standard breaks in the morning and afternoon and at lunch[.]"  T. at 477.  It is unclear to the Court how the ALJ concluded that this opinion

supported the determination that plaintiff's bladder issues could be accommodated by normal breaks in a workday when the opinion is internally inconsistent, concluding that plaintiff's need to use the restroom was both "urgent" and "not [] urgent[.]"  Id. at 477; see id. at 82.

Finally, the ALJ relied on plaintiff's ability to "engag[e] in activities[.]"  T. at 82.  Plaintiff's activities of daily living, such as showering, dressing, "occasionally cleaning to include toilets and sinks, vacuuming, dusting, shopping in stores, putting groceries away, driving a vehicle, and attending scheduled medical appointments[,]" do not equate to an ability to stay on task for eight hours a day and attend work every day.  T. at 78, 84 (citing T. at 271, 273-74, 314-16, 400, 404).  "[A]n ALJ can look [] to a claimant's activities of daily living, which sometimes shed light on the ability to make and keep a routine and/or a daily schedule."  Amanda R. v. Comm'r of Soc. Sec., 556 F. Supp. 3d 145, 156 (N.D.N.Y. 2021) (citation omitted).  However, an "ability to attend medical appointments and engage in other daily activities of limited duration do not correlate to the [p]laintiff's ability to stay on-task . . . or the likelihood that he [or she] would miss work several days per month because of exacerbations of [] chronic back or neck pain."  Patrick M., 2019 WL 4071780, at *10 (footnote omitted).  The Second Circuit has recently stated "that relying on attendance at medical appointments is unhelpful in determining whether an individual with significant psychiatric issues can consistently show up and successfully function in a work environment."  Rucker v. Kijakazi, No. 21-621-CV, __F.4th__, 2022 WL 4074410, at *5 (2d Cir. Sept. 6, 2022) (citations omitted); see also Stoesser v. Comm'r of Soc. Sec., No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011), report and

recommendation adopted, 2011 WL 381941 (N.D.N.Y. Feb. 3, 2011) ("[T]he question is not whether [the p]laintiff can sit for *some* period of time or perform daily activities on a limited basis, but whether his treating physician correctly assessed that he cannot sit for more than 4 hours in an 8–hour workday.  Nothing in the [the p]laintiff's testimony concerning his activities of daily living indicated an ability to sit for longer periods than assessed by [the provider].").

In plaintiff's Function Report, she explained that she has to constantly use the restroom, her "over use of toilet, being on the toilet creates pain, bruises on back of my legs.  Many times urine won[']t come out so I'm stuck in bathroom for long periods of time.  Right hip socket will pop causing me pain and feel stuck.  Tarsal tunnel pain in foot is affected by being on the toilet a lot."  T. at 273.  She also wrote that she is "stuck eating what [she] can get for free from others."  Id.  She wrote that she could fold clothes and towels, clean the toilet and sinks, put groceries away, vacuum, and dust. See id.  She testified that she will "sometimes" go grocery shopping but cannot do it all of the time because of her "lower body pain and swelling."  Id. at 131.  She also testified that her mother or her boyfriend prepare meals, do the dishes, wash her clothes, take out the trash, vacuum, sweep, and mop.  See id. at 131-32.  Plaintiff testified that she cleans the toilet.  See id. at 132.  Plaintiff informed the consultative examiners that she can "cook[] randomly, clean[] occasionally, and shop[] occasionally.  She showers most days and dresses every day."  Id. at 404; 400.

These activities do not equate to an ability to stay on task for eight hours a day and attend work for five days a week.  See Fairuz B. v. Saul, No. 19-CV-00129 (MJR), 2021 WL 267657, at *7 (W.D.N.Y. Jan. 27, 2021) ("None of the cited activities involve

sitting or standing for extended periods of time nor are they indicative of plaintiff's ability to perform sedentary work, with some additional restrictions, over the course of an eight-hour workday."); Anderson v. Colvin, No. 5:12-CV-1008 (GLS/ESH), 2013 WL 5939665, at *6 (N.D.N.Y. Nov. 5, 2013) ("Nothing in [the plaintiff's] testimony concerning her activities of daily living indicates they are performed on a regular or continuing basis akin to a workday, and thus they do not contradict [the nurse practitioner's] opinion.").

The ALJ also did not discuss the consistency between the various medical opinions, including the consultative examiner's opinion. See Elizabeth P. v. Comm'r of Soc. Sec., No. 3:20-CV-891 (CFH), 2022 WL 507367, at *13 (N.D.N.Y. Feb. 18, 2022) (citation omitted) (contrasting Tamara M. which had "two highly restrictive opinions" and noting that "all five medical opinions opining off-task limitations are work preclusive."). The ALJ did not identify a medical opinion that disputes the opined limitations concerning plaintiff's ability to stay on task, attend work, or sustain an ordinary routine. Cf. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("[T]he Commissioner failed to offer and the ALJ did not cite any medical opinion to dispute the treating physicians' conclusions . . . ."). The Court also notes that the ALJ discounted Dr. Slowik's psychiatric consultative opinion partly because it "was based on only [a] single exam of" plaintiff; however, the ALJ took no issue with Dr. Jenouri's physical consultative examination opinion being based on a single examination of plaintiff. T. at 72, 81. In sum, the ALJ did not identify a contrary medical opinion to those indicating that plaintiff would have limitations in her ability to stay on task, attend work, or sustain an ordinary routine, and the reasons provided do not constitute overwhelmingly compelling

justifications to negate the five treating providers' and one consultative examiner's opinions.  Accordingly, remand is warranted on this ground.

## C.  Step Five

Plaintiff's final argument concerns the ALJ's reliance "solely on the grids" as opposed to seeking testimony from a vocational expert to make his step-five determination.  Dkt. No. 13 at 26-27.  The Commissioner's only statement concerning the ALJ's step-five determination is in a footnote, which states: "Plaintiff's derivative argument that the step-four and step-five determinations are not supported by substantial evidence should be rejected, because they hinge entirely on the supportability of the ALJ's RFC assessment[.]"  Dkt. No. 18 at 22, n.6.

"Generally, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the 'grids')."  Stephens v. Colvin, 200 F. Supp. 3d 349, 362 (N.D.N.Y. 2016) (citations omitted).  "The grids are inapplicable in cases where the claimant exhibits a significant nonexertional impairment."  Id. (citing Rosa, 168 F.3d at 82; 20 C.F.R. § 404.1569a(c)(2)).  "The ALJ cannot rely on the grids if a nonexertional impairment has any more than a 'negligible' impact on the claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."  Id. (quoting Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013)).  "A nonexertional impairment is non-negligible 'when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'"  Id. (quoting Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010)).  "The mere existence of a nonexertional impairment does not automatically require the production of a vocational

expert nor preclude reliance on the guidelines." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).

As the Court has determined that the ALJ's RFC determination is not supported by substantial evidence, the Court need not address the ALJ's reliance on the Grids. Rather, on remand, the ALJ should reconsider the applicability of the Grids or necessity for testimony from a vocational expert in light of the limitations concerning time off task and absenteeism, and plaintiff's need to change positions and elevate her legs. See Stephens, 200 F. Supp. 3d at 363; Petersen v. Astrue, 2 F. Supp. 3d 223, 239 (N.D.N.Y. 2012) ("[T]he RFC determination was flawed and must be revisited on remand. Accordingly, the step five analysis will likewise need to be revisited.").


**V. Conclusion**

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that the Commissioner's decision is **REVERSED and REMANDED for further proceedings**; and it is further

**ORDERED**, that the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 18) is **DENIED**, and plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 23, 2022
　　　 Albany, New York

Christian F. Hummel
U.S. Magistrate Judge